IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ROGER WAYNE HAGER,

       Plaintiff,

v.                                CASE NO. 2:09-cv-01357

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Roger Wayne Hager (hereinafter referred to as "Claimant"), filed an application for SSI on January 2, 2008, alleging disability as of June 1, 1995, due to nervous problem, anxiety, personality disorder, depression, mental instability, and mood swings.  (Tr. at 14, 87-93, 110-17, 139-43, 155-59.)  The claim was denied initially and upon reconsideration.  (Tr. at 14, 42-46, 51-53.)  On May 22, 2008, Claimant requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. at 54-58.)  The hearing was held on November 3, 2008 before the Honorable William R. Paxton.  (Tr. at 24-39, 62, 66.)  By decision dated December 11, 2008, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 14-23.)  The ALJ's decision became the final decision of the Commissioner on October 16, 2009, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On December 14, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If

2

the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in

3

substantial gainful activity since the alleged onset date.  (Tr. at 16.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of alcohol dependence, antisocial personality disorder, and alcohol induced mood disorder.  (Tr. at 16.)  At the third inquiry, the ALJ concluded that Claimant's impairments, including the substance use disorders, do meet or equal the level of severity of any listing in Appendix 1 but that if Claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in Appendix 1.  (Tr. at 17- 20.)  The ALJ then found that if Claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels, reduced by nonexertional limitations.  (Tr. at 20-22.)  Claimant has no past relevant work.  (Tr. at 22.)  Nevertheless, the ALJ concluded that if Claimant stopped the substance use, he could perform jobs such as cleaning occupations, hand packer, and warehouse worker which exist in significant numbers in the national economy.  (Tr. at 22- 23.)  On this basis, benefits were denied.  (Tr. at 23.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In <u>Blalock v. Richardson</u>, substantial evidence was defined as

4

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 33 years old at the time of the administrative hearing. (Tr. at 27-28.) He has a tenth grade education. (Tr. at 28.) He has never worked. (Tr. at 29.) He has been hospitalized multiple times at Mildred Mitchell-Bateman Hospital, a state-operated psychiatric hospital, and incarcerated on multiple occasions, including a Federal Penitentiary, for threatening public officials, including a judge, a prosecutor, and the president, and private citizens, including his mother and grandmother. (Tr. at

17-18, 27-28, 169.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Psychiatric Evidence

On January 11, 2000, Claimant was admitted to Mildred Mitchell-Bateman Hospital ["MM-BH"]. He was discharged on January 20, 2000. In a report titled "Discharge Summary and Final Psychiatric Diagnosis," Stephen Durrenberger, M.D. states:

> ADMISSION DIAGNOSES:
> Axis I:   Polysubstance abuse.
>           Rule out depressive disorder, NOS
>      II:  Antisocial personality disorder.
>      III: None.
>
> DISCHARGE DIAGNOSES:
> Axis I:   Polysubstance abuse.
>      II:  Antisocial personality disorder.
>      III: None.
>      IV:  Ongoing family problems.
>      V:   GAF: 60
>
> REASON FOR ADMISSION:
> The patient allegedly threatened to kill himself and others, and allegedly cut his wrists but the marks on his wrist were so superficial he did not require any medical treatment.
>
> CONDITION ON DISCHARGE:
> The patient was alert and oriented, and he was cooperative. His mood was euthymic with congruent somewhat sarcastic affect. His speech was coherent with normal pace and prosody. His thinking was organized and goal directed. There was no evidence of any psychotic form of thought. He denied any auditory hallucinations. He did not voice any delusions and denied any suicidal or homicidal ideations. He was calm motorically at the time of discharge.

HISTORY OF PRESENT ILLNESS:
The patient was readmitted after being discharged only
this past Dec. He was actually discharged on New Year's
Eve after a very short stay for again as on previous
hospitalization displaying prominent antisocial
personality disorder characteristics. Prior to this last
hospitalization he had been abusing substances, this
time, however, he comes back with reports that he is on
multiple medications stating that he just doesn't take
them. According to his mother, information obtained
later on during this hospitalization, he had apparently
been physically aggressive with his grandmother and this
is really the reason why he was sent back up here again.

PAST PSYCHIATRIC HISTORY:
Indicates that he has had several hospitalizations at MM-
BH [since 06/23/95, Tr. at p. 183], was at one point a
participant in the Neo Program and has been chronically
noncompliant aggressive substance-abusing patient...

SOCIAL HISTORY:
It is unclear if the patient has been abusing substance
since he refused admission labs so we are unable to
assess a urine drug screen. No other details are
available.

PHYSICAL EXAMINATION:
The patient refused a physical examination but he had one
on his last hospitalization, which is a mere two weeks
prior to this hospitalization. He was found at that time
only to have a slightly increased pulse, otherwise a
normal exam.

LABORATORY:
He refused all lab studies.

HOSPITAL COURSE:
The patient was admitted to A-4, evaluated by the
undersigned on 01-12 and at that time placed on lock-out
from his room from 9 to 11 am, 1 to 3 pm and 5 to 7 pm,
because he was known to refuse to participate in
activities on the unit. We felt it was beneficial for
him to get out of his room. He began to desire discharge
very shortly after this and actually eloped from the
hospital on 01-17 after not participating with any
activities throughout the week. He apparently very
carefully waited until an opportune moment and then
eloped. When he noticed how cold it was outside he

actually called and asked someone to pick him up.  His behavior indicated completely organized and well planned out thinking and actually some insight when he left and realized that he would not be able to make it in the cold weather, returning on his own.

I met and evaluated the patient after this.  The patient consistently refused any evaluation up to this point, but he finally agreed to conversation on 01-18.  We actually had a lengthy conversation.  The patient stated that he did not know why he was here, that his grandmother thought he was trying to cut his wrist, but he stated that the marks on his wrist were actually there from prior to his last discharge.  He denied depressed mood, denied suicidal ideation, he said he originally did it for attention only.  He again stated that he did not take the medications that he was given at Shawnee Hills, that he did not feel he needed them.  He stated that his mother was trying to convince him to no longer go to Shawnee Hills and he also stated that he would like to do something with his life, but admitted it would be difficult with all the times that he had been in the hospital.  He was very frustrated by that and felt that this place was making it hard for him to get a job.  He is also aware that he does not have his GED.  He still has not taken any responsibility for any of his behaviors and it was felt that since we did not have any treatments to offer him, there was nothing obvious that needed to be medicated.  The patient was not an acute threat of harm to himself or anyone else, that lengthening his hospitalization would not be beneficial for this patient. The patient was contacted by the social worker and transportation was arranged for home.  The social worker discussed with his mother his previous behaviors; she indicated that it was his physical aggressiveness towards his grandmother.  She was advised by the social worker to contact the authorities in the future to have him arrested rather than sending him to the state hospital as there is nothing that we can treat here anyway.

FORMULATON:
This is a 24-year old Caucasian male with prominent antisocial personality disorder, and probable ongoing substance abuse who is noncompliant to any treatment offered him. He is not really interested in treatment and until legal consequences are faced by the patient, he will likely continue to resurface in the state hospital system.

8

DISCHARGE PLANS:
The patient was discharged on no medication.  Regular
diet.  No activity restrictions.  He is scheduled a
follow up appointment with Shawnee Hills on 01-26-00 at
9:30 am, but indicated that he would not likely keep this
appointment.

(Tr. at 169-71.)

On January 31, 2000, Dr. Durrenberger wrote that Claimant was

readmitted to MM-BH and released the next day, February 1, 2000, to

the custody of the West Virginia State Police:

The patient was uncooperative, attempted to make illegal
telephone calls, calling bomb scares at various
facilities, but was noted to be displaying no evidence of
psychosis.  His speech was coherent with normal pace and
prosody.  His thinking was organized and goal directed.
He denied suicidal or homicidal ideation, denied
hallucinations, and there was no evidence of any
delusion.  His motor activity was calm.  His mood was
cheerful with a rather sarcastic and congruent affect.
He walked around smiling at the staff and enjoying his
manipulations of the staff.  He was discharged to the
company of the police due to his calling in bomb
scares...

[Patient] was admitted through Kanawha County under IEMC
status as a readmission after he allegedly took an
overdose [Clonazepam also known as Klonopin] and was
transferred from Boone Memorial Hospital to Charleston
Area Medical Center ["CAMC"]...while he was at the
emergency room, he allegedly called in a bomb scare to a
local facility (possibly the Capital Building) in
Charleston.  He was then transferred to MM-BH after an
evaluation at CAMC.  Upon arrival here, the patient was
placed on detainee status on the third floor.  According
to the staff, the patient went behind the nurse's station
and ripped up his detainee chart.  He laughed about it.
The patient was taken to court and then was admitted to
01/31/2000...When asked to cooperate, he cussed at the
staff and laughed at them.  He was then transferred to
the fourth floor where he then gained access to a
telephone and called a bomb scare in to a local hospital.
He freely admitted making the calls and taunted the staff
into calling the police on him.

9

On 02/01/2000, he was seen by the undersigned. He laughed and freely stated that he knew he didn't need to be here in this hospital. He asked the undersigned to call the police and get him out of here. When he was told that we were in the process of contacting the police, he laughed and shouted, "Good luck" in a very sarcastic tone of voice. He then attempted to make several more phone calls and had to be redirected by the staff and eventually had to placed in the time-out room.

State police were contacted. They revealed that they had at least four felony warrants for the patient and that they were very interested in coming here, picking him up, and taking him to jail. Later in the day of 02/01/2000, he was discharged into the custody of the police...

MENTAL STATUS EXAMINATION: This patient would not consent to a mental status review but did make several requests and demands indicating that he was fully aware of his actions. He was fully aware of the consequences of his behavior, taunted us to send him to jail, and stated that was where he wanted to go anyway. His mood was cheerful. His affect was congruent. His speech was coherent, with normal pace and prosody. His thinking was noted to be organized and goal directed. He did deny hallucinations and denied suicidal or homicidal ideations after arrival here as well. His motor activity was calm...

FORMULATION: This is a 24-year old, single, Caucasian male with prominent antisocial personality disorder along with polysubstance abuse who manipulates the system to avoid responsibility and then appears to do things to entertain himself, such as calling in bomb scares, thinking that he won't get in trouble because he is in a psychiatric hospital. Since it is obvious that he knows what he is doing, the acts are premeditated and he fully understands the consequences. Since he has stated the consequences to us, we feel that he is much better served by facing legal consequences for his behavior. Therefore, we have discharged him to the police where it is expected he will spend a serious amount of time in jail for the several bomb scares he has called in over the past several days during and prior to this hospitalization.

AFTERCARE PLAN:
1.   The patient was discharged with no medication.
2.   Dietary recommendations - none.

10

3. Activity recommendations and follow-up are not necessary.
4. The patient was discharged to the custody of the West Virginia State Police.

(Tr. at 178-80.)

Medical Records from FMC Lexington show that Claimant received medical care while federally incarcerated at various times. (Tr. at 262-83.) On May 15, 2001, notes indicate "Hx [diagnosis] Paranoid Psychosis Adjustment Disorder...Inmate states that his right arm continues to shake and he wants medication to assist in sleep." On November 3, 2001, notes state

> Officer reporting inmate had been observed by the CO swallowing a razor blade...No bleeding or lacerations to oral cavity or lips...he states that he put the razor blade in his mouth but then he spit it back out and threw it into the toilet and flushed it. Alert and oriented x3. Pt [patient] is smiling and giggling as he is explaining that he did not swallow razor blade.

(Tr. at 280.) On April 8, 2002, notes indicate "I was called in because Inmate Hager was noted placing a razor blade in his mouth...I was told an officer witnessed this." (Tr. at 279.) On June 7, 2002, notes state "I was asked to...give Hager an injection of Haldol 100 mg immediately due to acting out behavior." (Tr. at 277.)

On August 6, 2003, Shahid Masood, M.D. wrote that Claimant was committed to MM-BH for exhibiting threatening behavior towards his mother and verbalizing suicidal ideations: "The patient is a 28-year old white male who was released from jail on probation on 07-29-2003. The patient served four years in jail secondary to

11

threatening the judge and prosecutor...The patient reported that while he was in jail, he received Prolixin Decanoate injections secondary to his 'aggressive behavior.'"  (Tr. at 190.)

On August 15, 2003, Dr. Masood wrote in the discharge summary:

> The patient has about 12 previous psychiatric hospitalizations at Bateman Hospital, most of the time for threatening and aggressive behavior.  He also spent some time in jail secondary to making several bomb threats in January 2000...The patient reported that he had a history of drinking and benzodiazepine abuse in the past but has been in full remission (not drinking alcohol or using any drugs) for the past four years...[However, Dr. Masood noted that his urine drug screen was positive for benzodiazepine] He was educated about his substance abuse problem but his insight regarding substance abuse was poor.  The patient did not show any motivation to get help and refused to participate in MICA groups.  The patient did not exhibit any self-injurious or threatening behavior while on the Unit but on 08-12-03 he became agitated and threatened a female staff...The patient reported that he understood the consequences of his angry behavior and stated, "But that's how I am." For the next 48 hours he did fairly well...He was compliant with his medications.  His mother was contacted about discharge planning.  She reported that the patient could come back and live with her.  The patient's parole officer was also informed...After Care:  Medications: Zoloft 50 mg po qd, Vistaril 50 mg po tid, Depakote 500 mg po bid.  Follow up appointment made at Advantage Valley in Boone County.

(Tr. at 187-89.)

Medical Records from FMC Lexington show that Claimant received medical care while federally incarcerated at various times.  (Tr. at 262-83.)  Records dated May 7, 2004, note that Claimant stated "I feel like I might do something to get myself in trouble like hurt someone...I have hurt people in the past and I might do it again...Potential for dangerousness." (Tr. at 275.)  Notes dated

May 11, 2004 state "Probable severe personality disorder...poor impulse control." (Tr. at 273.) Notes dated May 18, 2004 state "Pt [patient] refusing all meds since 5/10/04...personality disorder with mood instability." (Tr. at 274.) A note dated May 29, 2004 states

> Inmate Hager, he has smeared feces over his inside door window and covered his outside window with a blanket and is unresponsive to verbal stimuli...and is covered by a blanket lying on his bed...earlier in the PM requesting coffee...agreed to give inmate coffee if he cleaned off his window and took his blanket down.  Inmate complied (and) appeared to be without injury or complaint.

(Tr. at 271-72.)  On June 1, 2004, handwritten notes although largely illegible, clearly state "severe personality disorder with mood and thought instability." (Tr. at 269.) On June 29, 2004, notes state "Pt [patient] non-compliant with meds...states he doesn't need meds at this time." (Tr. at 270.)  On November 30, 2004, Claimant underwent a mental health clinic follow-up wherein he was diagnosed with "Bipolar Disorder." (Tr. at 268.) On September 19, 2005, Claimant was treated for an "alleged multiple episodes of assault and rape over the last one and a half weeks" wherein it was noted that there were "no lacerations, abrasions, scabs, ecchymosis or other traumatic marks visible." (Tr. at 267.) On January 14, 2006, Claimant was treated for two 1/4-inch facial lacerations and "small scrapes over forehead" due to a fight. (Tr. at 266.)  On February 4, 2006, Claimant was allegedly "sucker punched" and treated for "several superficial scratches." (Tr. at

265.)  Records state that Claimant was hospitalized on April 7, 2006 because "inmate allegedly swallowing a razor blade...There were no lesions noted to the oral cavity...This inmate had defecated and smeared the feces on the door, walls and the floor." (Tr. at 262-63.)

On January 28, 2008, a State agency medical source completed a Disability Determination Examination of Claimant, which included a mental status examination.  (Tr. at 198-202.)  The evaluator, Donna J. Cooke, M.A., Licensed Psychologist, stated:

> It appears his complaints are more attributable to poor social skills, rather than mental illness...Prior psychiatric hospitalizations were denied...The claimant was federally charged with making bomb threats to public entities.  He was released from federal prison on January 1, 2008 after a four-year period of incarceration.  From 2001 to 2003, he was jailed for two-and-one-half years at FCI Beckley, West Virginia for writing threatening letters to a judge and prosecutor.  Prior to that, he was incarcerated more than ten times at the regional jail for harassing several county 9-1-1 operator centers.  He was also charged with destruction of property, underage drinking, etc.
>
> MENTAL STATUS EXAMINATION: Orientation: Alert and oriented x 3. Mood: Observed mood was euthymic. Affect: Broad. Thought Processes: Organized, relevant, and logical. Thought Content: Insufficient for obsessions, delusions, or phobias. Perceptual: Perception was not indicative of illusions, depersonalization, or hallucinations. Insight: Seemed fair, as evidenced by his reasoning ability. Judgment: Average, based on the envelope question. Suicidal and Homicidal Ideation: Free of active suicidal or homicidal thought patterns. Immediate Memory: Average. Recent Memory: Average. Remote Memory: Based on the ability to provide background information, average. Concentration: Average, as the claimant calculated serials 3 from 20 with no mistakes. Psychomotor Behavior: Unremarkable.

14

DIAGNOSTIC IMPRESSION:
Axis I     No Diagnosis.
Axis II    Antisocial Personality Disorder.
Axis III   None reported.

DIAGNOSTIC RATIONALE: The claimant reported no symptoms
of mental illness.  He has a long history of antisocial
behaviors, which he attributes to his episodic alcohol
use to excess.  Given his recent incarceration, he has
not used alcohol in four years.

DAILY ACTIVITIES: Typical Day: The claimant does not
maintain a regular sleeping schedule, noting, "Whenever."
He stated, "I don't do much; just whatever."  Despite
questioning, no further information was provided
regarding daily routines.  Reported Daily Activities:
Personal grooming.

WEEKLY REPORTED ACTIVITIES: None reported.

MONTHLY REPORTED ACTIVITIES: None reported.

SOCIAL FUNCTIONING: Based on the claimant's interaction
with this examiner, average.

PERSISTENCE: Based on the claimant's participation during
the interview, average.

CAPABILITY: It is felt that the claimant would be capable
of managing personal benefits independently.

(Tr. at 198-201.)

On February 5, 2008, a State agency medical source completed
a Psychiatric Review Technique form.   (Tr. at 203-216.)   The
evaluator, Jeff Harlow, Ph.D., Licensed Psychologist, found
Claimant's antisocial personality disorder impairment was not
severe. (Tr. at 203, 210.) Dr. Harlow found that Claimant had no
limitations regarding restrictions of activities of daily living,
difficulties in maintaining social functioning, difficulties in
maintaining concentration, persistence or pace, and no episodes of

15

decompensation, each of extended duration. (Tr. at 213.) He concluded in his analysis: "All KEY-Functional Capacities are indicated to be within normal limits by clinical results of the consultative evaluation. Therefore, it is concluded that the mental impairment is not severe. Comments about functional capacities made by the claimant are partially credible because they are externally inconsistent with these clinical results." (Tr. at 215.)

On April 7, 2008, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 217-230.) The evaluator, Timothy Saar, Ph.D., Licensed Psychologist, found Claimant's antisocial personality disorder impairment was not severe. (Tr. at 217, 224.) Dr. Saar found that Claimant had no limitations regarding restrictions of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. (Tr. at 227.) He concluded in his analysis:

> Claimant partially credible re: con[dition], as evidence
> does not support claim. Claimant can manage basic ADLs
> [activities of daily living] and social interactions. CE
> [clinical examiner] noted M/C/P/P - WNL [maintaining
> social functioning, concentration, persistence, pace -
> within normal limits]. Evidence does not support severe
> limitations in F.C. [functional capacity] due to a mental
> impairment. Decision - Impairment not severe.

(Tr. at 229.)

Inpatient records from MM-BH indicate that Claimant was

16

hospitalized on May 28, 2008 because "[h]e threatened to kill himself by swallowing a razor blade or cutting his wrist... He has been intimidating, oppositional, confrontational and irritable. He got into a fight with his mother and that is when he threatened suicide." (Tr. at 235.) In the June 4, 2008 discharge summary, Arturo Lumapas, M.D., attending physician, states:

> DISCHARGE DIAGNOSIS:
> AXIS I.   Mood Disorder, not otherwise specified.
> AXIS II.  Antisocial Personality Disorder.
> AXIS III. None reported.
> AXIS IV.  Psychosocial stressors - mild to moderate.
> AXIS V.   Discharge GAF: 45-50...
>
> The patient was irritable and oppositional during the interview...In short, the patient was released from prison two months ago and has mostly been staying at his mother's home although he spent the last two weeks or so at the crisis residential unit. He has reportedly been binge drinking. The patient denies this and states he does not drink alcohol or use drugs....He states he is here "on vacation" and there is no other purpose for him to be here. He denies any symptoms of depression, psychosis, anxiety symptoms or use of/issues related to drugs. He denies suicidal/homicidal thoughts...when he was placed back on his medications and was stabilized, we were then able to discharge him back out on June 4, 2008, with follow-up at the outpatient clinic in Boone County.

(Tr. at 231-33.)

Inpatient records from MM-BH indicate Claimant was hospitalized on June 25, 2008 due to depression, suicidal ideations and alcohol abuse: "Threats to swallow razor...Inappropriate laughter." (Tr. at 241-42.) In the July 10, 2008 discharge summary, Dr. Lumapas, M.D. states:

> DISCHARGE DIAGNOSES:
> AXIS I.    Alcohol Dependence.

17

```
                    Alcohol-induced Mood Disorder.
AXIS II.    Antisocial Personality Disorder.
AXIS III.   None active.
AXIS IV.    Psychosocial Stressors: Mild to Moderate.
AXIS V.     Current GAF: 45-50.

Condition of Patient at Discharge:
Mental Status Examination: The patient was no longer
withdrawing from alcohol.  He had been detoxified from
alcohol...He was no longer depressed.  He denied any
active suicidal/homicidal ideations.  He is taking his
medications regularly.  He stabilized on his medications
and we were able to discharge him back to the community
with follow up at the outpatient mental health clinic.
```

(Tr. at 241.)

Progress notes/forms from Marilou Patalinjug, M.D., Process Strategies, Medical Support Unit, indicate Claimant was treated on July 31, 2008 and August 7, 2008.  (Tr. at 249-52.)  Although the handwritten notes are largely illegible, the words "Alcohol Dependence" are legible on the form dated July 31, 2008.  (Tr. at 251.)  Further, the forms note in regard to Claimant's interpersonal demeanor that he "interacts well", has "direct" eye contact, has "appropriate" appearance, a "stable" and "dysphoric" mood, "adequate" sleep, "fair" and "good" appetite, "fair" energy, "constricted" affect, "normal" stream of thought, "appropriate" and "paranoid" content of thought, "baseline" cognitive functioning, and is not suicidal.  (Tr. at 250, 252.)  On the July 31, 2008 form, she circles "Y" indicating substance abuse.

On October 9, 2008, Dr. Patalinjug completed a "Mental Assessment of Ability to do Work-related Activities" form indicating that Claimant had moderate limitations in his ability to

18

"follow work rules, use judgment, function independently, understand, remember and carry out simple job instructions"; marked limitations in his ability to "relate to co-workers, interact with supervisors, deal with work stresses, maintain attention/concentration, understand, remember and carry out detailed, but not complex job instructions, behave in an emotionally stable manner, relate predicably in social situations"; and extreme limitations in his ability to "deal with the public, understand, remember and carry out complex job instructions." (Tr. at 257-58.) She marked "none" regarding "maintain personal appearance" and "slight" regarding "demonstrates reliability." (Tr. at 258.)  Dr. Patalinjug handwrote the words "very paranoid, poor concentration, poor attention span, mood swings, recent alcohol abuse" on the form.  (Tr. at 257-58.)  The form states "Please do not consider alcohol and/substance abuse contributing factors when answering these questions."  (Tr. at 256.)

On September 8, 2008, Jawaid Latif, M.D., MM-BH, stated that Claimant was hospitalized with a diagnostic impression of alcohol dependence for an "attempted suicide on 09-07-08 by overdosing on Ativan and alcohol; however, the patient denied this...The patient's blood alcohol level was 158.7 two days ago.  He reported that he was sober for three months after he was released from jail. He has been drinking regularly.  He denied withdrawal symptoms." (Tr. at 259-60.)

19

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in his consideration of Claimant's mental impairments and substance abuse and (2) the ALJ failed to give adequate weight to the opinion of Claimant's treating physician, Dr. Patalinjug. (Pl.'s Br. at 2-9.)

The Commissioner asserts that (1) substantial evidence in the record supports the ALJ's findings that alcohol abuse is a contributing factor material to the determination that an individual is disabled and (2) the ALJ gave proper weight to the opinion of Dr. Patalinjug. (Def.'s Br. at 9-17.)

Severe Mental Impairments and Alcohol/Substance Abuse

Claimant argues that the ALJ erred in his consideration of Claimant's mental impairments and substance abuse. (Pl.'s Br. at 2-6.) Specifically, Claimant asserts:

> The ALJ erred in this case because the mental impairments cannot be separated from the substance abuse, but the ALJ still found the substance abuse was a material contributing factor to the determination of disability. Even if the ALJ could have separated the substance abuse from the mental impairments, the mental impairments without the substance abuse are still disabling and the ALJ's decision should be reversed...The claimant has extensive evidence in the record that shows his mental impairments clearly meet or equal the listings 12.04 and 12.08. There is no definite, evident period in the record that the claimant was not abusing drugs and alcohol with which to find that the alcohol abuse can be separated from his impairments.
>
> The claimant has psychiatric hospital records dating as far back as 6/23/1995. (Transcript pgs. 178-185). The claimant has been hospitalized for psychiatric reasons in

the past no less than twelve times...Records from Mildred
Mitchell Bateman Hospital show the claimant has
repeatedly been diagnosed with antisocial personality
disorder, borderline intellectual functioning, depressive
disorder, anxiety disorder, and polysubstance abuse.
(Transcript pgs. 169-177, 186-197, 198-202).  Many of Mr.
Hager's hospitalizations were based on his numerous
suicide attempts.  (Transcript pgs. 169-177).  The record
shows the claimant has attempted suicide no less than six
times, although he denies the attempts.

Alternatively, even if the ALJ found that the drugs and
alcohol can be separated from the claimant's impairments,
the impairments are still severe enough that they meet
12.04 and 12.08...

Most importantly, the claimant continued to suffer from
serious mental impairments as well as suffered episodes
of decompensation while in federal prison, presumably out
of reach of drugs and alcohol...

The prison records clearly indicate that the claimant
continued to suffer from mental impairments when in
substance abuse remission and while taking psychotropic
medications.  (Transcript 262-283)...

The ALJ erred in finding that the claimant suffered no
episodes of decompensation while not drinking and taking
his medications...

The ALJ erred in finding that the claimant's alcoholism
can be separated from his mental impairments.
Alternatively, even if the claimant's alcoholism can be
separated, the ALJ erred in not finding that the claimant
suffers from listing level mental impairments even when
alcohol is not a contributing factor.  Lastly, based on
the substantial evidence of record, the ALJ erred in
finding no episodes of decompensation.

(Pl.'s Br. at 3-6.)

The Commissioner responds that there is substantial evidence

to support the ALJ's finding that Plaintiff's alcohol abuse is

material to a finding of disability.  (Def.'s Br. at 9-12.)

Specifically, the Commissioner asserts

21

> The ALJ recited the key facts linking Plaintiff's repeated hospitalizations with Plaintiff's binge drinking (Tr. 18). The ALJ then compared that history to evidence concerning Plaintiff's improved condition during his period of post-incarceration sobriety...The ALJ's determination in this case is well-articulated and carefully applies Congress' directive that benefits not be awarded in cases where substance abuse is material.

(Def.'s Br. at 12-13.)

The ALJ found that Claimant's mental impairments, including substance use disorders, meet listings 12.04, 12.08, and 12.09. (Tr. at 17-18.) He also found that if Claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on Claimant's ability to perform basic work activities; therefore, Claimant would continue to have a severe impairment or combination of impairments. (Tr. at 18-19.) However, he concluded that if Claimant stopped the substance use, Claimant would not have an impairment or combination or impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §416.920(d)):

> In activities of daily living, the claimant has moderate restriction. The claimant testified that he helps with household chores sometimes. The claimant indicated that he is able to perform personal care with without problems (Exhibit 4E and 8E). In social functioning, the claimant has moderate difficulties. The claimant visits with friends and family members. The record indicates, "He maintains good relations with family members" (Exhibit 4F).
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant testified that he can read the newspaper. The record indicated that the claimant's insight "seemed fair, as evidenced by his reasoning ability." On January 23,

2008, Donna Cooke, MA, noted his judgment, immediate memory, recent memory, remote memory and concentration to be average (Exhibit 4F). The undersigned took note of the fact that this evaluation was done during a period when the claimant testified he was sober. The claimant indicated he can count change. He can read and write (Exhibit 4E). The claimant completed the functional report by himself and returned it within a reasonable time (Exhibit 5F).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, each of extended duration when he is not drinking and taking his medications. The record indicated that the claimant decompensates due to not taking his medications. Dr. Lamapas noted that, "it is believed that he has not been compliant with his medications when he is drinking" (Exhibit 8F).

Because the remaining limitations would not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria would not be satisfied if the claimant stopped the substance use.

(Tr. at 19.)

In 1996, Congress amended the Social Security Act to preclude individuals suffering from alcoholism from receiving benefits. Specifically, "[a]n individual shall not be considered to be disabled . . . if alcoholism . . . would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(c). The corresponding regulations state that alcoholism is a contributing factor if the claimant would not be disabled if he stopped using alcohol. 20 C.F.R. § 404.1535(b) (2006). The amendment ("Amendment") applies to all cases which were not "finally adjudicated by the Commissioner" prior to March 29, 1996. Pub. L.

104-121, § 105(a)(5)(A), 110 Stat. 847, 853 (1996). Claimants whose cases were finally adjudicated prior to March 29, 1996 continued receiving benefits until January 1, 1997. Id.

The Amendment and the Social Security regulations set up a two-step analysis. First, the ALJ must determine whether the claimant is disabled. See 20 C.F.R. § 404.1535(a) (2006). If the ALJ does conclude that the claimant is disabled, he must then ask whether alcoholism is a contributing factor to claimant's disability. See id. Alcoholism is a contributing factor if the claimant would not be disabled if he stopped drinking. See 20 C.F.R. § 404.1535(b)(1) (2006).

In the subject claim, the ALJ fully considered Claimant's credibility in regard to his mental disabilities, including his substance abuse, depression, antisocial personality disorder, and threats to kill himself and others:

> The claimant testified that he was sober from January 2008 (upon being released from prison) through April 2008. The claimant testified that he currently drinks one to two times per month. He indicated that he drinks, "whatever I buy", noting either a six or twelve pack of beer. The claimant testified that he had attempted suicide "a couple of times."

> If the claimant stopped the substance use, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

24

The objective findings do not support the limitations alleged by the claimant and reveal that he is not fully credible. The claimant alleges depression, although when questioned at the hearing he indicated that he was depressed "sometimes." On September 9, 2008, Dr. Jawaid Latif noted, "he denied any suicidal attempts in the past" (Exhibit 14F). However, the record contains six hospital admissions for attempted suicide. It is additionally noted that his prison medical record indicated an alleged ingestion of a razor blade (Exhibit 15F).

The claimant is prescribed medication for his antisocial personality disorder, however the record indicates that he is noncompliant with taking his medications. The record indicated that the claimant's noncompliance with his medication is secondary to consumption of alcohol. The record further indicates that the claimant decompensates when he is noncompliant with his medications and drinking. The evidence demonstrates that when the claimant is sober, his concentration, persistence and pace are within normal limits.

(Tr. at 18-21.)

The undersigned proposes that the presiding District Judge **FIND** that substantial evidence supports the Commissioner's decision that Claimant is not disabled. Claimant's alcohol and substance abuse are contributing factors material to his disability in that Claimant would not be disabled if he stopped drinking and took his medications as prescribed. In his decision, the ALJ determined that Claimant's alcohol abuse caused severe impairments. The ALJ determined that Claimant's abuse was disabling, but that if Claimant stopped drinking, he would have a residual functional capacity for a full range of work at all exertional levels, reduced by nonexertional impairments. (Tr. at 20.) When these limitations were included in a hypothetical question to the vocational expert,

25

the vocational expert identified a number of jobs in the national and regional economies that Claimant can perform. (Tr. at 23.)

Also, contrary to Claimant's assertions, the ALJ did not find that Claimant had no episodes of decompensation. Rather, the ALJ found:

> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, each of extended duration when he is not drinking and taking his medications. The record indicated that the claimant decompensates due to not taking his medications.

(Tr. at 19.)

> The claimant is prescribed medication for his antisocial personality disorder, however the record indicates that he is noncompliant with taking his medications. The record indicated that the claimant's noncompliance with his medication is secondary to consumption of alcohol. The record further indicates that the claimant decompensates when he is noncompliant with his medications and [or] drinking.

(Tr. at 21.)

Claimant argues that "prison records clearly indicate that the claimant continued to suffer from mental impairments when in substance abuse remission and while taking psychotropic medications." (Pl.'s Br. at 6.) However, a closer examination of these records show that Claimant was noncompliant with his medications during his incarceration, which undoubtedly contributed to his problems during his imprisonment. (Tr. at 270, 274.)

Weight Given Opinion Evidence

Claimant argues the ALJ failed to give adequate weight to the opinion of Claimant's treating physician, Dr. Marilou Patalinjug,

26

which was given during a period of time when Claimant was admittedly consuming alcohol, thereby strengthening the argument that Claimant's alcohol abuse cannot be separated from his impairments. (Pl.'s Br. at 6-10.) Specifically, Claimant asserts:

> Dr. Patalinjug's evaluation found the claimant has extreme limitations in his ability to deal with the public, and to understand, remember and carry out complex job instructions; marked limitations in his ability to relate to co-workers, interact with supervisors, deal with work stressors, and maintain attention/ concentration, understand, remember and carry out detailed, but not complex job instructions, behave in an emotionally stable manner, and relate predictably in social situations; and moderate limitations in his ability to follow rules, use judgment, and function independently, as well as moderate limitations in his ability to understand, remember, and carry out simple job instructions...The assessment specifically directs the Doctor to "not consider alcohol and/substance abuse contributing factors when answering these questions." (Transcript pg. 256). The Doctor presumably listed "mood swings, paranoia, and recurrent alcohol abuse" as diagnoses which support the assessment, and was clearly not basing the assessment results on alcohol abuse. The ALJ therefore erred in not giving controlling weight to the treating physician's assessment.

(Pl.'s Br. at 7.)

The Commissioner responds that the ALJ did not err in his consideration of Dr. Patalinjug's opinion because the regulations specifically authorize the ALJ to afford varying degrees of weight to treating physician opinions depending on a wide variety of circumstances. Specifically, the Commissioner asserts:

> There were only two treatment notes contained in the record from Dr. Patalinjug (Tr. 249-50, 251-52), so it does not appear that Plaintiff was involved in a very longstanding treatment relationship with Dr. Patalinjug. Moreover, even though the form completed by Dr.

> Patalinjug instructed the doctor to support her opinions
> and findings – it explained the importance of "relat[ing]
> particular medical findings to any assessed limitation in
> capacity" and noted that the "usefulness of your
> assessment depends on the extent to which you do this"
> (Tr. 256) – Dr. Patalinjug included very little narrative
> support for the opinions she expressed (Tr. 257-58).  She
> wrote few words as support for her opinions (Tr. 257-58).

(Def.'s Br. at 14.)

In regard to the opinion evidence regarding Claimant's mental

status, the ALJ made these findings:

> On January 28, 2008, Donna Cooke, MA, examined the
> claimant at the request of the State agency and found
> antisocial personality disorder.  Ms. Cooke noted the
> claimant's social functioning to be average, persistence
> average, his insight was fair, average judgment,
> immediate memory, recent memory, and remote memory.  Ms.
> Cooke noted his concentration was average based on his
> ability to calculate serial 3s from 20 with no mistakes.
> Ms. Cooke noted the claimant attributes his antisocial
> behavior to his episodic alcohol use (Exhibit 4).
>
> Dr. Jeff Harlow, PhD, a State agency medical consultant
> reviewed the record on February 5, 2008, completed a
> psychiatric review technique form in which he indicated
> the claimant had no severe impairments.  Dr. Harlow noted
> no functional limitations.  Dr. Harlow further noted "all
> key functional capacities are indicated to be within
> normal limits by clinical results of the consultative
> evaluation.  Therefore, he concluded that the mental
> impairment is not severe.  Comments about functional
> capacities made by the claimant are partially credible
> because they are externally inconsistent with these
> clinical results (Exhibit 5F).  Little weight is given to
> Dr. Harlow's opinion because it is consistent with Ms.
> Cooke's findings, but not the record as a whole.
>
> Dr. Timothy Saar, PhD, a State agency medical consultant
> reviewed the record on February 5, 2008, completed a
> psychiatric review technique form in which he indicated
> the evidence does not support severe limitations in
> functional capacity due to mental impairment.  Dr. Saar
> opined that the claimant is partially credible because
> the evidence does not support his claim.  The claimant

28

can manage basic activities of daily living and social
interactions (Exhibit 6F).  Little weight is given to Dr.
Saar's opinion because it is consistent with Ms. Cooke's
findings, but not the entire record.

Dr. Marilou Patalinjug, M.D., the claimant's treating
physician completed a mental assessment of ability to do
work-related activities form in which multiple moderate,
marked and extreme limitations were noted (Exhibit 13F).
The undersigned noted that the timing of the evaluation
was during a period of time when the claimant admittedly
was consuming alcohol.  The undersigned further noted the
contrast between Dr. Patalinjug's evaluation and Ms.
Cooke's clinical findings, which were found during a
period of sobriety (See Exhibit 4F).  While Dr.
Patalinjug's evaluation noted such severe limitations,
Ms. Cooke noted the claimant's functional capacity was
average.  Dr. Patalinjug clearly considered limitations
imposed on the claimant by his alcohol use, as she
mentioned the alcohol use in her assessment.

In evaluating the entire record, the undersigned finds
that the claimant decompensated during periods of alcohol
consumption due to the fact that the claimant is
noncompliant with his medications.  The record supports
a finding that when the claimant is sober and compliant
with his medications his level of functioning is not
limited beyond the limitations found in finding No. 6
above.  In sum, the above residual functional capacity
assessment is supported by the findings of Ms. Cooke, MA,
which were made during a documented period of sobriety.

(Tr. at 21-22.)

In evaluating the opinions of treating sources, the
Commissioner generally must give more weight to the opinion of a
treating physician because the physician is often most able to
provide "a detailed, longitudinal picture" of a claimant's alleged
disability.  See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)
(2006).  Nevertheless, a treating physician's opinion is afforded
"controlling weight only if two conditions are met: (1) that it is

29

supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight

we give your treating source's opinion." Id. §§ 404.1527(d)(2),
416.927(d)(2).

The undersigned has thoroughly reviewed all the records from
Dr. Patalinjug and proposes that the presiding District Judge **FIND**
that the ALJ reached the correct conclusion when finding that Dr.
Patalinjug's opinions should not be given controlling weight. As
stated earlier, a treating physician's opinion is afforded
"controlling weight only if two conditions are met: (1) that it is
supported by clinical and laboratory diagnostic techniques and (2)
that it is not inconsistent with other substantial evidence." Ward
v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R.
§ 404.1527(d)(2) (2005).

In the subject claim, the opinions Dr. Patalinjug states in
the October 9, 2008 "Medical Assessment of Ability to Do Work-
Related Activities (Mental)" contradict the mostly positive
statements made in her treatment notes dated July 7, 2008 and
August 7, 2008. (Tr. at 249-50, 251-52, 256-58.) For example, Dr.
Patalinjug's treatment notes indicate that in regard to Claimant's
interpersonal demeanor that he "interacts well", has "direct" eye
contact, has "appropriate" appearance, a "stable" and "dysphoric"
mood, "adequate" sleep, "fair" and "good" appetite, "fair" energy,
"constricted" affect, "normal" stream of thought, "appropriate" and
"paranoid" content of thought, and "baseline" cognitive
functioning. (Tr. at 250, 252.) In the October 9, 2008

31

assessment, Dr. Patalinjug's statements regarding Claimant's abilities are all negative, save his ability to "maintain personal appearance" and "demonstrates reliability." (Tr. at 258.) Claimant was consuming alcohol throughout this period. Thus, Dr. Patalinjug's "Medical Assessment of Ability to Do Work-Related Activities (Mental)" is inconsistent with the other substantial evidence of record, including her own assessments.

The ALJ fully and correctly considered the consultative examining psychologists and the state agency record-reviewing medical sources of record in determining Claimant's mental status. The ALJ did consider the evidence of record from Dr. Patalinjug and weighed her opinions in keeping with the applicable regulations. Thus, the court proposes that the presiding District Judge **FIND** that the ALJ's decision is supported by substantial evidence because the ALJ considered Claimant's alcohol abuse in keeping with applicable statute, regulations and other SSA policy.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B),

and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  January 6, 2011  
        Date

_Mary E. Stanley_  
Mary E. Stanley  
United States Magistrate Judge